**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KIMBERLY S. RORICK,                                     Case No. 1:14-cv-312

                 Plaintiff,                                     Dlott, J.
                                                                Bowman, M.J.
        v.

MARC H. SILVERMAN, D.D.S., et al.,

                 Defendants.


**REPORT AND RECOMMENDATION**
**REDACTED PUBLIC VERSION**


        Nearly a year ago on July 22, 2016, Defendants Marc. H. Silverman, D.D.S. and

Silverman Dental, LLC ("Defendants"), through counsel, filed a motion seeking

enforcement of a settlement agreement in the above captioned case.   Plaintiff filed a

memorandum in opposition, to which Defendants filed a reply.  Though no formal order

was entered, disposition of the motion was informally stayed while the parties continued

to attempt to resolve extra-judicially both this case and a second, related case.   In June

2017, Plaintiff's counsel notified the Court that the parties had been unable to reach a

final resolution, and orally renewed a previously filed written motion for leave to file a

sur-reply in opposition to the long-pending motion to enforce settlement.[1] The

undersigned granted Plaintiff's motion for leave to file a sur-reply following a telephonic

status conference, and I now recommend GRANTING the Defendants' motion to

enforce the previous settlement.

_____

[1]On September 9, 2016, Plaintiff filed a motion seeking leave to file a surreply in opposition to the motion
to enforce the settlement agreement, without attaching a copy of the tendered surreply.  After the case
was reassigned to a new district judge in January 2017, all pending motions were referred to the
undersigned magistrate judge. The surreply was filed on June 30, 2017.

1

Although Plaintiff has requested oral argument, the undersigned concludes that such argument is not essential to the fair resolution of this case or helpful to the Court. *See* Local Rule 7.1(b)(2).

### I.    The Confidentiality of this Report and Recommendation and Plaintiff's Limited Waiver of Attorney Client Privilege

The Court granted Defendants' request to file their motion to enforce the settlement under seal, and correspondingly permitted all further briefs on the motion to be filed under seal, since the terms of the agreement remain confidential.  (Doc. 54). The undersigned finds that the confidentiality of those terms constitutes a compelling interest that justifies retaining under seal the parties' memoranda and this Report and Recommendation.  In an effort to balance the public interest, a highly redacted copy of this Report and Recommendation (R&R) has been filed in the public record.  The undersigned has filed this R&R under seal notwithstanding the existence of many cases (cited herein) in which similar confidential settlement terms are discussed in publicly available judicial decisions. *See also, generally Rudd Equip. Co., Inc. v. John Deere Const. & Forestry Co.*, 834 F.3d 589, 593-594 (6th Cir. 2016) (holding that "only the most compelling reasons can justify non-disclosure of judicial records" and that trial court was justified in lifting seal where it had failed to make findings or legal conclusions in support of initial nondisclosure to the public (additional internal quotation and citation omitted)).

The Court also notes that in Plaintiff's response and sur-reply, Plaintiff has disclosed to opposing counsel and to this Court numerous communications that ordinarily would fall within the attorney-client privilege.  Those communications form the basis of Plaintiff's defense to the motion to enforce the settlement agreement, and primarily involve communications between Plaintiff and her current and former

2

attorneys. Plaintiff's disclosures constitute a clear, though limited, waiver of the attorney-client privilege as to all matters relating to the pending motion. The undersigned concludes that waiver extends to some statements made by Plaintiff and her attorneys during the course of an *ex parte* hearing held before Judge Beckwith on July 25, 2016. *See generally Dinsmore & Shohl LLP v. Gray*, 2016 WL 7852522 (S.D Ohio Jan. 5, 2016)(citing *Rubel v. Loew's Home Ctrs., Inc.*, 580 F.Supp.2d 626 (N.D. Ohio 2008)).

## II.    General Background

Kimberly Rorick and her husband Peter Newberry, who reside in Kentucky, underwent root canals from the same Ohio dentist back in the early 2000s (for Rorick) and the mid-1990s (for Newberry). Over time, both Rorick and Newberry became unhappy with the results. In November 2013, Rorick and Newberry filed separate dental malpractice cases in Kentucky against that former dentist, Marc H. Silverman, D.D.S. and his unincorporated dental practice, Silverman Dental, LLC (hereinafter "Silverman"), and included other claims relating to what they allege was Silverman's concealment of his wrongdoing.[2] Newberry, a practicing attorney, filed his case *pro se*. Rorick was represented by an Ohio attorney, Anthony Iaciofano, with her husband acting as co-counsel.

---

[2]Ms. Rorick initiated her case in federal court, alleging diversity jurisdiction, and included an allegation that the amount in controversy exceeds $75,000. Mr. Newberry initially filed his case in Kentucky state court, but the case was removed to federal court by Silverman based upon diversity jurisdiction. Although no amount in controversy was alleged in Mr. Newberry's original complaint, Silverman alleged that the requisite minimum was satisfied, considering the plaintiff's request for treble damages, punitive damages, and attorney's fees. *But see Westlake Vinyls, Inc. v. Goodrich Corp.*, 2014 WL 2816070 at *4 (W.D. Ky. June 23, 2014)(no authority suggests the amount in controversy for diversity jurisdiction should be measured based on the amount of legal fees).

3

While the two cases were still proceeding in the Eastern District of Kentucky, Silverman filed motions to dismiss the cases based upon a lack of personal jurisdiction. After hearing oral argument, the district court in Kentucky transferred both cases to this district, where they were assigned to Senior District Judge Sandra S. Beckwith. *See also Newberry v. Silverman*, Case No. 1:14-cv-313. After the cases were transferred, Silverman filed new motions to dismiss under Rule 12(b)(6), arguing that under Ohio law and the applicable statute of limitations, Rorick and Newberry had failed to state any claims. Although Silverman partially succeeded on a similar motion filed in the related case, Case No. 1:14-cv-313,[3] the Court denied Silverman's motion to dismiss Rorick's dental malpractice claim based upon a discovery rule exception to the statute of limitations when foreign objects are left in a patient's body.

------

[3]On August 18, 2014, Judge Beckwith granted Silverman's motion to dismiss Newberry's complaint in its entirety based upon the Ohio statute of limitations. (Doc. 25 in Case No. 1:14-cv-313). However, in a published decision filed on May 29, 2015, the Sixth Circuit partially reversed, vacating the dismissal of a single claim of fraud. The Sixth Circuit agreed that Silverman was not subject to personal jurisdiction in Kentucky, and that Newberry's claims for dental malpractice, negligence, spoliation of evidence, and intentional or negligent infliction of emotional distress were all time-barred under applicable and controlling Ohio law. However, the appellate court held that "Newberry's fraud claim was a separate and independent cause of action" that was not subject to the statute of limitations applicable to medical malpractice claims, but instead was subject to a four-year limitations period under Ohio law. Still, the Sixth Circuit found that the fraud claim as alleged by Newberry "failed to meet the pleading requirements of Rule 9(b)," Fed. R. Civ. P. Therefore, the appellate court directed this Court to "allow Newberry an opportunity to file an amended complaint" in which he would be permitted to re-assert only the fraud claim, if pled with particularity under Rule 9(b).

On remand, Newberry filed his amended complaint but Silverman again moved to dismiss on grounds that the complaint failed to include dates for the allegedly fraudulent statements and representations. On November 2, 2015, Judge Beckwith denied Silverman's motion, reasoning that discovery would "allow both parties to try to establish more precise dates." The Court agreed that the amended complaint did not technically comport with Rule 8, insofar as it "is neither 'short' nor 'plain,' is repetitive, and makes overly liberal use of the word 'fraudulently.'" However, the Court was "satisfied that the Defendants are able to sufficiently comprehend the nature of Plaintiff's fraud claim to permit them to prepare an answer." (Doc. 37 at 4 in Case No. 1:14-cv-313). The undersigned entered a calendar order on December 11, 2015, directing the parties to complete discovery by November 28, 2016 and to file any dispositive motions by December 16, 2016. No motions were filed, and the final pretrial and trial dates set before Judge Beckwith were vacated upon the reassignment of Case No. 1:14-cv-313 to U.S. District Judge Barrett. Since then, the record reflects that Judge Barrett has held several status conferences, most recently on June 28, 2017. Notwithstanding the expiration of pretrial deadlines, the minute entry from that conference directs the parties to continue to coordinate discovery, with a follow-up status conference set for July 27, 2017.

The discovery rule applied to Rorick's case (but not to Newberry's) because Rorick had alleged that in 2001, Silverman left a "piece of file" in what has been identified as "tooth 18," and that she first discovered that fact on November 20, 2012. Because Rorick filed her complaint on November 18, 2013, within one year of her alleged discovery of the foreign object, the Court wrote:

> The question then becomes whether she reasonably and diligently could have discovered that foreign object at an earlier point in time. Rorick's allegations of headaches, tooth decay and infections may well be found to be "cognizable events" that gave rise to a duty to reasonably investigate her condition much earlier than she did. And she may not be able to satisfy Section 2305.113(D)(3)'s requirement that Rorick show "by clear and convincing evidence" that she could not have reasonably discovered the piece of a file. But given the explicit exception in the statute for foreign objects, the Court cannot conclude at this early juncture that Rorick's allegations on their face fail to plausibly allege a claim that she could not have reasonably discovered the foreign object, as opposed to the alleged negligence in the method of performing the root canals, prior to November 2012.

(Doc. 24 at 9).[4] After the Court's denial of Silverman's motion to dismiss, the parties conducted discovery. At the conclusion of discovery, Silverman filed a new motion seeking summary judgment.

On December 22, 2015, the Court partially granted and partially denied Silverman's motion. To the extent that Silverman alleged that Rorick's malpractice claim was time-barred, the Court denied the motion because it could not "conclude as a matter of law that Rorick reasonably should have discovered the piece of metal prior to its removal in November 2012." (Doc. 43 at 10). The Court reasoned that on the record presented, the issue of whether Rorick's decision to forego any investigation of

---

[4]As a condition to proceeding with the claim, the Court directed Rorick to cure a deficiency to the complaint under Ohio law by filing a Certificate of Merit. (*See* Docs. 24, 25).

Silverman's 2001 treatment at an earlier date was "reasonable" remained an issue of fact that a jury would need to resolve.

On the other hand, the Court partially granted Silverman's motion for summary judgment on other issues, and significantly limited her damages. Plaintiff's original complaint alleged that as a result of Silverman's malpractice during four separate root canal procedures between 2001 and 2005, she experienced chronic headaches, tooth decay, and infections, eventually losing two of her teeth. Based upon the statute of limitations, only the 2001 root canal on tooth 18 remained at issue. However, Plaintiff had failed to offer any expert evidence as required under Ohio law to prove a causal link between the headaches that she alleged to have suffered for years and the 2001 root canal. "The Court concludes that Rorick is precluded from seeking damages for headaches she alleges were caused by Silverman's malpractice, due to a lack of expert opinion on the issue." (Doc. 43 at 13).[5]

In addition to limiting her damages, the Court granted Silverman's motion for summary judgment on Rorick's related spoliation claim, which was based upon allegedly "missing" dental records that Silverman was unable to provide during discovery, based upon the fact that the records could no longer be accessed from an outdated laptop computer. In granting judgment to Silverman on that claim, the Court noted "no authority that a 'failure to maintain' access to an aging laptop is tantamount to intentional or willful destruction of records," and that Rorick had produced no other evidence that Silverman had acted with any deliberate or willful intent as required to

---

[5]Damages resulting from Rorick's headaches appear to have constituted the bulk of Plaintiff's compensatory damages, which were alleged to exceed the requisite $75,000 in controversy required to support diversity jurisdiction.

prove spoliation.  (Doc. 43 at 14).  On February 29, 2016, the Court denied Rorick's motion to certify its December 22, 2015 Order for interlocutory appeal.  (Doc. 50 at 1).

On May 19, 2016, Rorick's lead attorney, Anthony "Tony" Iaciofano, filed a motion to withdraw from representation, attaching an affidavit that cited "irreconcilable differences and fundamental disagreements" that made continuing representation "impossible."  (Doc. 52-1, affidavit).  Attorney Iaciofano asserted that his withdrawal would not have any material adverse effect on Rorick, since she would continue to be represented by co-counsel, her husband, Peter Newberry.  *Id.*

On June 13, 2016, Rorick, through Newberry, filed a response in opposition to her attorney's motion to withdraw.  In her opposition to the withdrawal of Iaciofano, Plaintiff states: "Plaintiff's counsel [P. Newberry] has a recently developed conflict of interest, known to counsel, which prohibits co-counsel [Newberry] from continuing as co-counsel for Plaintiff at trial."  (Doc. 53 at 1).

On June 14, 2016, Silverman's counsel filed a formal motion seeking leave to file a motion to enforce a prior settlement agreement under seal.

On June 21, 2016, Attorney Iaciofano filed a reply in support of his motion to withdraw, stating in relevant part:

> Plaintiff's Response to the Motion to Withdraw states Plaintiff has never been informed of the "serious and fundamental irreconcilable differences which have arisen."  Attorney Iaciofano has assumed throughout the handling of this matter that all relevant case matters and issues have been presented to Ms. Rorick by her husband, Mr. Newberry.  In an abundance of caution, however, based upon Ms. Rorick's Affidavit, Attorney Iaciofano has now prepared and delivered a letter to Ms. Rorick which fully explains these fundamental and irreconcilable differences, items that Mr. Newberry has apparently avoided. Furthermore, the Defendant has now filed a Motion to Enforce Settlement.  Thus, a serious conflict of interest has arisen between Attorney Iaciofano and Ms. Rorick relating to the issue of whether a settlement agreement has been entered into or not.  Attorney Iaciofano will most probably be compelled to testify at Defendants' Motion

7

to Enforce Settlement hearing, thereby creating further irreconcilable differences.

Incredibly, Attorney Newberry states in the Response to Motion to Withdraw that he has recently developed his own conflict of interest known to counsel. Attorney Iaciofano has no such knowledge and Mr. Newberry has failed to articulate with any specificity the identity and/or scope of his alleged conflict. Mr. Newberry is obviously very much up to speed regarding his wife's case, and is an experienced litigator who is pursuing his own pro se representation of his own case against Dr. Silverman. Finally, if Mr. Newberry refuses to continue his representation of his wife in this litigation, there are obviously hundreds of other competent trial lawyers that can be retained to represent Ms. Rorick in substitution of Mr. Iaciofano.

(Doc. 55). Judge Beckwith scheduled an *ex parte* conference on the motion to withdraw, in order to explore the issues presented by Plaintiff and her attorneys without disclosure of matters protected by the attorney-client privilege to the Defendants. (Doc. 65, Transcript of *ex parte* conference filed under seal). Ultimately, Judge Beckwith granted Iaciofano's motion to withdraw from further representation. Despite his alleged conflict of interest in representing his wife at trial, P. Newberry has never moved to withdraw from representation and continues to represent Rorick in opposing Silverman's motion to enforce a settlement agreement.[6]

### III. Communications Pertaining to Settlement

Following Judge Beckwith's summary judgment decision and refusal to certify that order for interlocutory appeal, U.S. Magistrate Judge Karen Litkovitz convened a

---

[6]Ohio Rule of Professional Conduct 3.7 generally prohibits a lawyer from acting as an advocate at any trial in which the lawyer "is likely to be a necessary witness" unless the testimony relates to an "uncontested issue" or "the nature and value of legal services rendered" or disqualification would work a "*substantia*l hardship on the client." (emphasis original); *see also generally Mentor Lagoons, Inc. v. Teague*, 71 Ohio App.3d 719, 595 N.E.2d 392 (Ohio Ct. App., 1991). Because P. Newberry has never moved to withdraw and Silverman has never moved to disqualify him, this Court does not consider the application of Rule 3.7 to this case. Curiously, at the ex parte hearing on the motion of Iaciofano to withdraw, Rorick expressed her belief and concern that if Iaciofano were permitted to withdraw, she would be unrepresented because her husband "wasn't my attorney." (Doc. 65 at 6). However, she simultaneously contradicted herself by stating that "Peter has been acting on my behalf because he's an attorney, because he was involved in this case from the beginning as co-counsel but not trial counsel." (*Id.*)

conference to discuss setting a court-facilitated settlement conference. Judge Litkovitz's March 8, 2016 minute entry reflects the Court's determination that a formal settlement conference would not be productive, and directs the parties to "continue settlement negotiations on their own," with instructions to contact Judge Beckwith's chambers for a trial date if the matter was not resolved on or before March 22, 2016.

On March 31, 2016, Plaintiff's counsel conveyed an offer to settle Rorick's case for the sum of $[REDACTED]. Silverman rejected the offer. Through Attorney Danny Merril Newman Jr. (hereinafter "Newman"), Silverman conveyed a counter-offer on April 4, 2016. In the pending motion to enforce a settlement agreement, Silverman argues that Rorick accepted Silverman's counter-offer on May 10, 2016. (Doc. 58).

Rorick argues in her response in opposition to Silverman's motion that she agreed only to the amount….[REDACTED]. The relevant and material facts of the respective parties' communications are undisputed, as reflected in exhibits attached to both the Defendants' motion to compel settlement and the Plaintiff's response in opposition. Relevant portions of the communications are set forth below in roughly chronological order:[7] For reasons that will become apparent in the analysis portion of this Report and Recommendation, the Court begins with communications between Plaintiff's counsel and Defendants' counsel before setting forth the separate internal communications between Plaintiff's two attorneys.

## A. Communications Between Opposing Counsel[8]

- 3/31/16 email from attorney Iaciofano to D. Newman, cc to P. Newberry, stating:

---

[7]The parties agree as to the chronological order of the exchanges, notwithstanding slight discrepancies in the time stamps of the various computers.
[8]In an attempt to further differentiate counsel's similar surnames, the Court has included their first initials.

> I have authority from my client to settle her claim for the amount stated above [REDACTED] in response to your client's [REDACTED] offer.

- 4/4/16, responsive email from D. Newman to Iaciofano, cc to P. Newberry,[9]

    rejecting Rorick's offer and making the following clear counter-offer:

    > I spoke at length with my client regarding Kim's settlement demand. The settlement demand is rejected. [REDACTED]. Thus, if there will be a settlement it would be conditioned upon [REDACTED]. The company considers this a nuisance value settlement. Dr. Silverman indicates that teeth that have RCTs many times require retreatment, especially those teeth 12 year old. Moreover, my client absolutely denies any negligence whatsoever….

    > My client will not offer more than [REDACTED]. If that is not accepted, Dr. Silverman is prepared to go to trial, so please provide me multiple dates/times that your client's experts are available for their respective discovery depositions and we will coordinate our professional calendars for same. Further, please provide me with your professional availability for presumably this 3-day trial. I would like to work with you on coordinating our calendars so we can inform the court when to schedule trial.

(Doc. 58 at 9-10).

All parties agree that neither Rorick nor either of her attorneys conveyed any response to Silverman's April 4, 2016 counter-offer prior to May 10, 2016. Having heard no response to Silverman's April 4, 2016 counter-offer, D. Newman followed up with Iaciofano and P. Newberry using the same email chain (with the April 4 offer) and reiterating his inquiry about moving forward with trial dates if necessary.

- 5/10/16 follow-up email from D. Newman to Iaciofano, cc to P. Newberry:

    > I need to get back to the court regarding trial dates. Please provide me with your professional availability for presumably this 3-day trial. I would like to work with you on coordinating our calendars so we can inform the court when to schedule trial. Thanks, Dan

- 5/10/16 responsive email from Iaciofano to D. Newman, cc to P. Newberry:

---

[9]Another person at the Reminger law firm is also cc'd, but the role of that individual is unclear from the record and not material to the disposition of the pending motion.

> **We have a Settlement.  Send me** [REDACTED].

- 5/10/16 responsive email from D Newman to Iaciofano, cc to P. Newberry:

> **Acknowledged.  Will do.**

(Doc. 58 at 9, Exhibit A, emphasis added).

In addition to the above exchange between D. Newman and Iaciofano, on which P. Newberry was cc'd, a tandem email exchange occurred between P. Newberry and D. Newman.   D. Newman's May 10 email (which incorporated the prior April 4 counter-offer email) is repeated solely for clarity and context:

- 5/10/16 email from D. Newman to Iaciofano, cc to P. Newberry:

> I need to get back to the court regarding trial dates.  Please provide me with your professional availability for presumably this 3-day trial.  I would like to work with you on coordinating our calendars so we can inform the court when to schedule trial.  Thanks, Dan

- 5/10/16 responsive email from P. Newberry to D. Newman, cc to Iaciofano:

> **Thought this case was settled for** [**REDACTED**]?

- 5/10/16 response from D. Newman to P. Newberry, cc to Iaciofano:

> **News to me today.  Tony's email just prior confirmed it for the Rorick case.  [REDACTED].**

- 5/12/16 11:25 pm email from D. Newman to Iaciofano, cc to P. Newberry

> Attached is draft Stipulation for your review, and if you approve you may file it.  [REDACTED].

(Doc. 58 at 11, Exhibit B, emphasis added).

Plaintiff's counsel and Defendants' counsel had no further communication for five days, although P. Newberry and Iaciofano exchanged multiple emails unbeknownst to D. Newman.  The next communication between opposing counsel was as follows.

- 5/17/16 2:13 pm email from Iaciofano to D. Newman, cc to P. Newberry

> Hello Dan, please advise Peter and I as to the status of [REDACTED].
> Thank you!   Tony

(Doc. 62-1 at 20, Exhibit L).  Early in the evening on the same day, P. Newberry (for the

first time) emailed co-counsel and opposing counsel, alerting opposing counsel for the

first time to the existence of a dispute.

- 5/17/16 6:29 pm email from P. Newberry to Iaciofano, cc to D. Newman

  > Plaintiff never agreed to [REDACTED].  Her offer was crystal clear; a
  > dismissal with prejudice in exchange for $[REDACTED].  Period.

  > Dan, where and how did Tony accept your offer that was rejected by
  > Plaintiff?  If in writing, Please forward all correspondence between you
  > concerning settlement negotiations.

  > Thank you.

(Doc. 62-1 at 21, Exhibit M).   D. Newman's response an hour later reflects his

incredulity at the news.

- 5/17/16 7:30 pm email from D. Newman to P. Newberry and Iaciofano, cc to

  two additional Reminger law firm employees.

  > Peter,

  > Respectfully, what in the world are you talking about!?!?  You and Tony
  > both, specifically, and unambiguously responded on behalf of your
  > respective client, on May 10, accepting my clients' retort to your client's
  > original offer.  All emails are attached hereto for your edification, but you
  > already have them as you were on every single email between Tony and
  > me on settlement negotiations.  There aren't many.  Your client NEVER
  > made an offer, through Tony and/or you, of $[REDACTED] in exchange
  > for a dismissal.  After the conference with the Magistrate, see attached,
  > your client made a demand on March 31 (see attached – from Tony, which
  > you were copied on – demand of $[REDACTED]).

  > I retorted with a rejection of that demand, and an offer on April 4 (also
  > attached, also which you were copied on).  That offer was exceedingly
  > clear.  I did not hear a word regarding settlement from Tony or you since
  > April 4, hence my email of May 10 to you and Tony asking for trial dates.
  > That email is also attached hereto, and it forwarded the prior email of April
  > 4 (which had my clients' offer).  The ONLY responses to my May 10 email
  > to you and Tony was his email (attached – which you were cc'd on) and

12

your email (attached).  Both are clearly acceptances of my clients' offer (of April 4); nothing more, nothing less.

Your client NEVER made an offer that you allege "was crystal clear."  That is patently false.  Attached is every email of settlement negotiations, and you and Tony were on all of them.  Period.

We have a settlement agreement, as confirmed by both of you on May 10.  If your client does not follow through, we will file a Motion to Enforce Settlement Agreement, and I will seek court costs.  The attached emails cannot be more clear of the course of negotiations in this case.

Please file the Stipulation as was agreed.  [REDACTED].

-Dan

(Doc. 62-1 at 21-22, Exhibit M).

P. Newberry made no immediate response to the above lengthy email.  D. Newman followed up the next day with a shorter email directed to Iaciofano, but cc'ing P. Newberry, requesting that Rorick execute and file the Stipulation of Dismissal with the Court.

- 5/18/16 email from D. Newman to Iaciofano, cc to P. Newberry:

Attached is [REDACTED].

Please immediately file the Stipulation of Dismissal of Dr. Silverman as previously agreed.

Thanks, Dan.

(Doc. 62-1 at 23, Exhibit N).

On May 24, 2016, P. Newberry began a series of emails directed to D. Newman[10] that set forth P. Newberry's belief that Rorick "never agreed to [REDACTED]."  (Doc. 52-1 at 25, Exhibit P).  Plaintiff's memorandum in opposition to Defendants' motion to enforce the settlement agreement and the attached affidavit of P.

---

[10]P. Newberry does not indicate whether he cc'd Iaciofano on the emails, nor is that fact apparent from the copies of the emails, from which the original to/from/date fields have been redacted.

Newberry both discuss this series of emails.  (*See also generally*, Doc. 62-1 at 25-28, Exhibits P and Q).    However, because the emails were exchanged after the dispute arose, they are not particularly relevant to the Court's discussion of the Defendants' motion to enforce a settlement agreement.

### B.  Communications Exclusively Between Plaintiff's Co-counsel

Although the above emails reflect all relevant communications between opposing counsel, Plaintiff opposes Defendants' motion to enforce the alleged settlement agreement on the basis of a separate set of communications that took place between her own co-counsel.   According to the affidavit of P. Newberry, on a date not specified but after receipt of Defendants' April 4, 2016 counter-offer, P. Newberry informed Iaciofano during a telephone call that Rorick was rejecting Silverman's April 4 counter-offer.  "Iaciofano then informed me that if Plaintiff did not settle [her] case, he was going to withdraw as counsel because the case was no longer worth his or his firm's time because of the loss of Plaintiff's claim for headache damages."  (Doc. 62-1, Affidavit at ¶ 3).

The next communication between Rorick's two attorneys was a brief exchange of telephonic text messages on May 3, during the period of time when Defendants were still awaiting a response to their April 4, 2016 counter-offer.

- 5/3/16 text from Iaciofano to P. Newberry:

    Hey Peter, we need to tell Newman and the Court something on Kim's case?

- 5/4/16 reply from P. Newberry to Iaciofano:

    Since you have indicated that you will not try her case and will seek withdrawal as counsel, Kim has given her authority to accept $[REDACTED] in exchange for her dismissal with prejudice.

- 5/4/16 text from Iaciofano to P. Newberry:

14

Ok, very good.

(Doc. 62-1 at 10, Exhibit D).

On May 10, 2016, both Iaciofano and P. Newberry finally responded to D. Newman's still pending April 4, 2016 counter-offer and request for trial dates with the emails set forth above.  Three days later, on Friday, May 13, 2016 after receipt of the draft [REDACTED] on May 12, P. Newberry first communicated that Rorick would not [REDACTED]:

- 5/13/16 3:09 pm email from P. Newberry to Iaciofano

    Since you have told Kim you will not try case, Kim agreed to settle case for $[REDACTED] in exchange for a dismissal with prejudice.  No other agreement.  Have you received settlement draft of $[REDACTED]?

(Doc. 62-1 at 15, Exhibit I).   Receiving no response, P. Newberry followed up on Saturday with a second email to Iaciofano, and emailed him a third time a few hours later:

- 5/14/16 12:49 pm email from P. Newberry to Iaciofano:

    She did not agree to give them anything other than dismissal with prejudice, so make sure you do not file dismissal unless [REDACTED].

- 5/14/16 4:10 pm email from P. Newberry to Iaciofano:

    Kim has not agreed to [REDACTED], only dismissal with prejudice.

(Doc. 62-1 at 16, Exhibit J).

Iaciofano responded to P. Newberry's three emails on Monday, the next business day.   Multiple emails were exchanged between co-counsel that day, reflecting an

escalating internal conflict.  Plaintiff, through P. Newberry, has attached the emails to

the memorandum in opposition to the motion to enforce the settlement agreement.[11]

- 5/16/16 2:26 pm email from Iaciofano to P. Newberry:

    Peter, Please review below all prior emails regarding the settlement, which included you as a recipient, particularly Dan Newman's emails where he made it very clear [REDACTED] as part of the settlement, which I certainly expected.  If you intend to attempt to set aside the Agreement, please deal directly with Mr. Newman.  He will most likely move the court to enforce the Agreement.  If this issue escalates I will be filing a Motion to Withdraw as counsel.

- 5/16/16 2:54 pm email from P. Newberry to Iaciofano:

    I gave you Kim's offer: $[REDACTED] in exchange for dismissal with prejudice.  Period.  Did you convey offer?  Did they accept?  I am confused.

- 5/16/16 2:55 pm email from P. Newberry to Iaciofano:

    Did you agree to something else?  If so, Kim did not authorize it.

- 5/16/16 3:09 pm email from Iaciofano to P. Newberry:

    I sent you Newman's proposal, which was extensive, and assumed you read it and shared it with Kim.  I also made it clear to you that during the court conference with the federal mediator Newman outlined what Silverman was proposing.  I am also confused.  Newman's email is clear.  Did you not see it?

- 5/16/16 5:26 pm email from P. Newberry to Iaciofano:

    Kim did not accept Newman's proposal.   She offered to accept $[REDACTED] in return for a dismissal with prejudice.  Period.

    Did you tell Newman that his offer was accepted?  Neither Kim nor I were ever informed of that, and Kim never authorized it.

- 5/1616 5:28 pm email from P. Newberry to Iaciofano:

---

[11]A portion of the email correspondence appears to be missing (or has been modified) in Plaintiff's exhibit. (*See generally* Doc. 62-1).  Specifically, original date/to/from fields of several emails have been deleted, despite appearing to have been replaced with words denoting at least some of the pertinent information. (*Id.* at PageID 472-474).

You must deal with Newman if you agreed to a deal with him without Kim's authorization.

- 5/16/16 5:33 pm email from Iaciofano to P. Newberry

I sent you the proposal and you eventually told me Kim would settle, period.  If you read the proposal and didn't agree with its terms, you should have told me Kim won't [REDACTED].  If Kim didn't authorize the settlement then I will inform Dan Newman accordingly.

- 5/16/16 5:37 pm email from Iaciofano to P. Newberry

I just told you I will notify him.  However, You gave me authority, since I have not dealt with Kim directly since I got involved in the case.

- 5/16/16 6:22 pm email from P. Newberry to Iaciofano

I sent you Kim's offer of settlement.  You apparently then communicated something different to Newman.  I was not included in that communication.

[REDACTED]?  You have never provided me or Kim with it.  Who agrees to sign something without seeing it?

- 5/16/16 6:23 pm email from P. Newberry to Iaciofano:

I gave you very specific authority.  I have no idea what you told Newman.

- 5/16/16 6:25 pm (duplicate) email from P. Newberry to Iaciofano:

I sent you Kim's offer of settlement.  You apparently then communicated something different to Newman.  I was not included in that communication.

[REDACTED]?  You have never provided me or Kim with it.  Who agrees to sign something without seeing it?

(Doc. 62-1 at 17-19, Exhibit K).

As set forth above, P. Newberry first alerted opposing counsel of his position on May 17, 2016, when he cc'd D. Newman on an email to Iaciofano that reiterated P. Newberry's position that "Plaintiff never agreed to [REDACTED]."  (Doc. 62-1 at 21, Exhibit M).  However, throughout the rest of May, P. Newberry sent additional communications directly to Iaciofano without copying opposing counsel on those communications.

17

- 5/19/16

Tony,

Seriously, would you ever advise a client to sign this?  Please confirm that you have presented Kim's offer of settlement to Defense counsel.  If rejected, please, per my previous request following your deposition of Dr. Silverman, withdraw me as counsel, and obtain trial date[s] for you to try [this] case.

Thank you.

Peter

P. Newberry's affidavit states that around the same time,[12] Attorney Iaciofano's "office" emailed him a copy of Iaciofano's motion to withdraw as counsel, and "an instruction not to contact Attorney Iaciofano."  (Doc. 62-1 at ¶15).  The referenced email ("Exhibit O"), dated May 19, 2016, appears to provide a copy of Iaciofano's motion to withdraw to both D. Newman and P. Newberry, but makes no reference to the "instruction not to contact" counsel.

Attached to Plaintiff's recently filed sur-reply is the affidavit of Kimberly Rorick, who attests similarly to her husband that she "expressly and specifically rejected Defendant's counter offer of April 4, 2016," and denies that Attorney Iaciofano had "any authority to accept" that offer.  (Doc. 71-1 at ¶¶2-3).  Rorick also attests that Iaciofano "was specifically instructed that I would never agree to [REDACTED]."  (*Id.* at ¶4).  In language that echoes her husband's emails, she attests that on May 4, Iaciofano "was given my authority to inform the Court and Defendants' attorney that I was only willing to dismiss my case against Defendants in exchange for $[REDACTED] from Defendants.

---

[12]Exhibit O reflects an email from Iaciofano's legal assistant and reflects the attachment of his "motion to withdraw as counsel." The attachment itself is not included in Exhibit O.  Moreover, although P. Newberry refers to the date of the email as May 17, Exhibit O is dated May 19, 2016, and appears to have been in response to P. Newberry's earlier email of the same date.

Period. No other items." (*Id.* at ¶5). Like Newberry, Rorick alleges that it was not until May 19, 2016 that she became aware "for the first time ever" of [REDACTED]. (*Id.* at ¶7).

It appears from Rorick's affidavit, as well as all other evidence in this case, including the transcript of the hearing before Judge Beckwith on Iaciofano's motion to withdraw, that Rorick did not communicate directly with Iaciofano during the course of settlement, but instead relied on her husband to do so. Her affidavit is notarized by Newberry, who is presumed to have prepared the affidavit in his role as her attorney.[13] The affidavit is devoid of any suggestion that Rorick had any *personal* contact by email or by phone with Attorney Iaciofano, nor does she state when or how she allegedly conveyed her rejection of the Defendants' April 4 counter-offer. Consistent with P. Newberry's affidavit and reference to the brief exchange of text messages between P. Newberry and Iaciofano, she refers to May 4 as the date when Iaciofano allegedly "was given my authority" to convey what Plaintiff now argues was a new counter-offer.

## IV.   Analysis

### A.  The April 4 Offer and May 10 Acceptance

"Because settlement agreements are a type of contract, the formation and enforceability of a purported settlement agreement are governed by state contract law." *Smith v. ABN Amro Mortg. Grp. Inc.*, 434 Fed. Appx. 454, 460 (6th Cir. 2011)(citing *Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992)). Controlling Ohio law recognizes settlement agreements as enforceable contracts to resolve a legal

---

[13]Unlike some states, Ohio's notary provisions contain no prescriptions against performing notarial acts for family members. *See* Closen, M., and Orsinger, T., *Family Ties That Bind, and Disqualify, Toward Elimination of Family-Based Conflicts of Interest in the Provision of Notarial Services*, 36 Va. U. L. Rev. 505 (Summer 2002).

dispute.  *Continental W. Condominium Unit Owners Ass'n v. Howard E. Ferguson, Inc.*, 74 Ohio St.3d 501, 502, 660 N.E.2d 431 (1996).  As with any contract, a settlement requires a meeting of the minds as well as an offer and acceptance.  *See generally Byrd v. Time Warner Cable*, Case No. 1:09-cv-772-SJD, 2012 WL 368208 (S.D. Ohio Feb. 3, 2012).  This Court has jurisdiction to enforce the settlement agreement of a case before it.  *See Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988).

The undersigned concludes that the parties, through counsel, entered into an enforceable contract of settlement that includes: [REDACTED].  No party has requested an evidentiary hearing and none is required because all relevant evidence is in writing or in prior statements made on the record to this Court.  Courts may summarily enforce settlement agreements without a hearing in order to promote the policy of speedy and reasonable resolution to disputes.  *See Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976) (summary enforcement of settlement determinable solely as a matter of law, rendering evidentiary hearing unnecessary, where terms were "clear and unambiguous."); *see also Michigan Regional Council of Carpenters v. New Century*, 99 Fed. Appx. 15, 20-21 (6th Cir. 2004) (holding no evidentiary hearing was necessary given undisputed nature of evidence which provided district court with sufficient basis to enforce settlement agreement); *RE/MAX Int'l., Inc. v. Realty One, Inc.*, 271 F.3d 633, 645-646 (6th Cir. 2001) (no evidentiary hearing required to enforce oral settlement where record before court provided all essential terms).

Defendants clearly rejected Plaintiff's March 31, 2016 offer to settle for $[REDACTED], and made a clear counter-offer on April 4, which was fully accepted by Plaintiff's counsel on May 10, 2016 without further condition.  The terms of the April 4, 2016 email from D. Newman to Iaciofano and P. Newberry were unequivocal.  The offer

20

first plainly rejected Plaintiff's offer: "I spoke at length with my client regarding Kim's settlement demand.  The settlement demand is rejected."  The email next made a definite and non-negotiable counter-offer, conditioned on:  [REDACTED].  The offer made clear that Silverman denied all liability and was offering only a "nuisance value" payment to Rorick of [REDACTED].  *Id.*  The April 4 email did not place a time limit on acceptance, but did state that if Rorick chose not to accept Silverman's offer, then counsel would need to provide trial dates.

There is no dispute that no response to the offer or other information was communicated back to Defendants prior to May 10.  On that date, D. Newman again contacted Plaintiff's two attorneys by email, forwarding his previous April 4, 2016 detailed offer, and reiterating the need to get back to the Court with trial dates.  In response on May 10, Iaciofano clearly accepted the reiterated April 4 offer, copying his co-counsel, P. Newberry.

- 5/10/16 responsive email from Iaciofano to D. Newman, cc to P. Newberry:

   **We have a Settlement.  Send me [REDACTED].**

- 5/10/16 responsive email from D Newman to Iaciofano, cc to P. Newberry:

   **Acknowledged.  Will do.**

(Doc. 58 at 9, Exhibit A, emphasis added).

In addition to being copied on the above exchange which specifically referenced Plaintiff's agreement to the April 4 offer and requested that Silverman provide [REDACTED], P. Newberry sent a separate response that appeared to confirm the same acceptance of all terms.   In response to the same email chain (including the April 4 offer and reiterating the need for trial dates), P. Newberry separately responded:

- 5/10/16 responsive email from P. Newberry to D. Newman, cc to Iaciofano:

**Thought this case was settled for $[REDACTED]?**

-   5/10/16 response from D. Newman to P. Newberry, cc to Iaciofano:

> **News to me today.  Tony's email just prior confirmed it for the Rorick case.  [REDACTED].**

In short, defense counsel's offer to [REDACTED] -  a condition of the Defendants' April 4 settlement offer - was explicitly acknowledged by Iaciofano on May 10, 2016, at a time when he retained full authority to negotiate a settlement on Plaintiff's behalf.  The same terms (including Iaciofano's "just prior" email confirmation on which P. Newberry had been copied), plus the additional reference to D. Newman's intent to [REDACTED] were referenced in the email between D. Newman and P. Newberry.  Two days later, on May 12, D. Newman forwarded the referenced Stipulation in an email directed to Iaciofano (with P. Newberry again copied), reiterating his intent to [REDACTED].  The fact that the parties did not execute a final agreement is of no consequence in light of the objectively clear agreement in this case.  *RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d at 646.

Plaintiff's sole defense to enforcement of this plain agreement is that she intended for her attorneys to only partially agree to the Defendants' April 4 offer, insofar as she agreed to the monetary settlement of $[REDATED], but did not intend for her attorneys to agree to the conditions of [REDACTED].   Because Plaintiff is bound by the actions of her attorneys in this case, her remedy, if any, lies in a separate action against her attorneys for professional malpractice.

**B.  Iaciofano Had Authority to Negotiate Settlement**

In Ohio, the authority to negotiate and settle a client's claim "need not be express, but may be ascertained from the surrounding circumstances."   *Elliott v. General Motors Corp.*, 72 Ohio App.3d 486, 488, 595 N.E.2d 463 (Ohio Ct. App. 1991).  As the Sixth Circuit has explained, "[b]ut for this rule, prudent litigants could not rely on

opposing counsel's representation of authorization to settle.  Fear of a later claim that counsel lacked authority to settle would require litigants to go behind counsel to the opposing party in order to verify authorization for every settlement offer."  *Capital Dredge & Dock Corp. v. City of Detroit,* 800 F.2d 525, 531 (6th Cir. 1986).

In this proceeding, as well as in the prior *ex parte* hearing before Judge Beckwith,[14] the evidence confirms that both Iaciofano and Plaintiff's spouse, co-counsel P. Newberry, had full authority to negotiate a settlement on Ms. Rorick's behalf.  All counsel and Ms. Rorick also have confirmed that communications concerning the terms of settlement were typically conveyed by Attorney Iaciofano to defense counsel, D. Newman.  "He is handling <u>all</u> settlement negotiations with defendants in this case, Your Honor."  (Doc. 65 at 25, P. Newberry, emphasis added).[15]  The parties also agree that negotiations between opposing counsel occurred <u>exclusively</u> in writing.  "All communications between Mr. Iaciofano and Mr. Newman were in writing, totally."  (Doc. 65 at 22, P. Newberry).

The only unique issue in this case is that Plaintiff herself communicated almost exclusively with her husband, and those communications were verbal, as one may expect from spouses living together.  Because her spouse also served as co-counsel, Rorick relied upon P. Newberry to pass along her settlement wishes to the person she viewed as her primary attorney, Iaciofano.  (*See* Doc. 65 at 5, Ms. Rorick explaining to Court that she communicated "through conversation between my husband and – and Mr. Iaciofano").  The fact that she gave both her husband and Iaciofano full authority to

---

[14]Statements made by an attorney "as an officer of the court…, pursuant to his ethical obligation, though conclusory, are made as if upon oath."  *Smith v. Anderson*, 689 F.2d 59, 64 (6th Cir. 1982).

[15]Indeed, despite proceeding *pro se* on his own claims against Silverman in Case No. 14-cv-313 , on at least one occasion P. Newberry asked  Iaciofano to separately convey a settlement demand on his behalf in his case. (Doc. 58 at 12, 3/31/16 email from Iaciofano to D. Newman).

speak for her in this case is repeatedly indicated in her statements to the Court. "Ever since I got involved, my communication has always primarily been with Peter." (Doc. 65 at 17). Both Iaciofano and Peter Newberry confirmed that Iaciofano's "last communication, direct communication with the plaintiff [Rorick]" was in March, shortly before Iaciofano conveyed Plaintiff's March 31, 2016 offer to settle the case for $[REDACTED]. (Doc. 65 at 12, P. Newberry; *see also* Doc. 65 at 17, Rorick).

"To determine whether the parties have manifested mutual assent, 'the law is only interested in objective manifestations of intent.'" *Tocci v. Antioach University*, 967 F. Supp.2d 1176, 1195 (S.D. Ohio 2013) (quoting *Rudd v. Online Resources, Inc.*, 1999 WL 397351 at *5 (Ohio Ct. App. June 18, 1999)(additional citations omitted).

> Because the inquiry examines the parties' outward, objective manifestations of intent, "expressions of assent are generally sufficient to show a meeting of the minds." *Nilavar*, 711 N.E.2d at 733." … [A] party manifests assent "wholly or partly by written or spoken words or by other acts or by the failure to act." *Ford v. Tandy Transp., Inc.*, 86 Ohio App.3d 364, 620 N.E.2d 996, 1006 (1993) … Because "manifested mutual assent rather than actual mental assent is the essential element in the formation of contracts," one party's "mistaken idea" as to whether acceptance of an offer has occurred cannot overcome the recognition of mutual assent based on conduct.

*Tocci*, 967 F. Supp. 2d at 1195 (additional internal citations omitted).

The facts presented reflect a case in which – objectively – Plaintiff's counsel negotiated and accepted a final settlement on May 10 with Defendants' counsel that all believed met with Plaintiff's full approval. The record also confirms that Rorick never conveyed any clear limitation on Iaciofano's authority to settle on her behalf. *Accord Rubel v. Lowe's Home Centers, Inc.*, 597 F. Supp.2d 742, 745 (N.D. Ohio 2009)(holding settlement was enforceable because client authorized lawyer to enter into settlement negotiations, which was legally sufficient to bind client to the final contract).

### C. Client's Disagreement With Terms Insufficient to Set Aside Settlement

The Court well understands that Rorick may sincerely, *subjectively* believe that her husband communicated her desire to reject the portion of April 4, 2016 offer that [REDACTED], and to instead convey a new counter-offer to settle for $[REDACTED]. (Doc. 65 at 19, Rorick's statements to the Court that she "asked Peter to communicate" her rejection of the April 4, 2016 terms).  Unfortunately for all concerned, P. Newberry did not communicate that fact to Defendants[16] but instead responded with communication to Defendants on May 10 that reiterated (objectively) the same acceptance in full of the Defendants' April 4, 2016 offer that had been conveyed moments earlier by Iaciofano.  Considering that P. Newberry's email objectively confirmed the more detailed acceptance of Silverman's offer previously conveyed by Iaciofano, Defendants reasonably and objectively believed that the terms of settlement were fully agreed.

Under Ohio law, when an attorney settles a client's claims without <u>any</u> authority to discuss settlement with opposing counsel, that settlement is not enforceable.  *See Morr v. Crouch*, 19 Ohio St.2d 24, 29, 249 N.E.2d 780 (Ohio S. Ct. 1969).  A different result occurs if authority is given, but the client disagrees with the terms.  As another court explained on analogous facts:

> [I]f an attorney is given authority to negotiate a settlement, but settles the client's claims on terms unacceptable to the client, such a settlement is

---

[16]In a portion of the transcript of the hearing before Judge Beckwith, Rorick stated that in addition to her reliance on her husband's May 4 text to Iaciofano, she was present during a telephone call in which her husband conveyed her rejection of Silverman's April 4 terms and the new "counter" offer of settlement [REDACTED].  Iaciofano denies that phone call ever took place. Regardless of Iaciofano's and Plaintiff's difference in recall concerning the existence and content of the alleged phone call, there is no dispute concerning what was objectively conveyed by both P. Newberry and Iaciofano to opposing counsel.  The alleged dispute between Plaintiff's counsel cannot provide a basis for setting aside an otherwise valid settlement agreement under Ohio law.

> enforceable despite the client's lack of consent.  *See Argo Plastic Products Co. v. City of Cleveland*, 15 Ohio St. 3d 389, 392 (1984) (explaining that a $500,000 settlement was enforceable against the city because the city's attorney had authority to negotiate the city's claims even though the city had authorized only a $2,500 settlement).  In these circumstances, the client's remedy, if dissatisfied, is an action against the client's attorney for professional malpractice.

*Patel v. Lowes Home Centers, Inc.*, Case No. 2:05-cv-775 2007 WL 544049 at *6 (S.D. Ohio Feb. 16, 2007) (recommending upholding settlement where it was undisputed that plaintiff authorized settlement negotiations, despite her later contention that she subjectively believed that she had authorized settlement only after she read and agreed to all written terms); *see also Rubel v. Lowe's Home Centers, Inc.* 597 F. Supp.2d at 746; *Kraras v. Safeskin Corp.*, 2004 WL 2375525 at *8 (S.D. Ohio 2004) *Mollis v. Rox Const. Co., Inc.*, 1992 WL 361438 at *3-4 (finding that even if attorney exceeded authority, settlement was correctly imputed to clients).

### D.  Alleged Miscommunication Between Plaintiff's Co-Counsel Also Insufficient to Set Aside Settlement

In opposition to Defendants' motion, Plaintiff insists that P. Newberry's text on May 4 to co-counsel Iaciofano constitutes a "counter-offer" to settle on different terms than communicated by the Defendants, agreeing only to the amount of $[REDACTED].[17]  Objectively, however, it was not reasonable for P. Newberry (or for Iaciofano as the recipient), to believe that the short text stating that his wife would finally accept $[REDACTED] for the dismissal of her case with prejudice somehow came with new strings attached.  After all, Newberry's text capitulating to the $[REDACTED] settlement came after: (1) Silverman's exceptionally clear April 4 offer that conditioned settlement on [REDACTED] and (2) Iaciofano's telephone call with Newberry in which

---

[17][REDACTED].  (*See also* Doc. 65 at 23, P. Newberry: "I think the fundamentals are in place.  The amount has been agreed to.").

Newberry initially rejected the April 4 offer and Iaciofano warned him that he intended to withdraw prior to trial if Plaintiff did not settle with Silverman.  The May 4 text from Newberry to Iaciofano reflects Newberry's focus on Iaciofano's threat to withdraw:

> Since you have indicated that you will not try her case and will seek withdrawal as counsel, Kim has given her authority to accept $[REDACED] in exchange for her dismissal with prejudice.

Unlike the April 4 email communicated by opposing counsel, which stated expressly and unequivocally that Silverman "rejected" Plaintiff's offer, Newberry's short text did not indicate in any fashion that Rorick (or Newberry) intended it as a rejection of the terms of the April 4 offer and the proposal of a new and different counter-offer.  The text instead appears to reflect a simple acceptance of the previously stated terms by Silverman, in a change of heart brought about by Iaciofano's stated intention to withdraw and the request for trial dates.

At the July 25, 2016 hearing before Judge Beckwith, Iaciofano confirmed the same understanding of his co-counsel's May 4 text:

> Mr. Newman, in the mediation conference with the federal mediator made it very, very crystal, crystal clear that this case would never settle without [REDACTED], which was part of his e-mail…
>
> I never, ever knew that Ms. Rorick rejected that proposal, and I never, ever knew that Mr. Newberry wanted me to make a new proposal.  And the reason why I know that is because I remember the text.  And, secondly, I would have never done it because my response would have been "Mr. Newberry, aren't you listening?  Mr. Newman made it crystal clear: Silverman wants [REDACTED]."
>
> I've been practicing law for 31 years and settled hundreds and hundreds of cases and [REDACTED]….

(Doc. 65 at 16).

Ironically, P. Newberry also previously conceded to this Court that D. Newman's objective belief that Plaintiff had accepted his offer was reasonable.

27

The e-mails speak for themselves.

I believe it's all very innocent.  I believe Mr. Newman rightfully believed his offer was accepted.  I believe Tony misinterpreted the counteroffer and accepted it a week later….

(Doc. 65 at 20).

Later in the same hearing, P. Newberry stated:

Ms. Rorick did consent to the $[REDACTED] in exchange for a dismissal with prejudice, which was never conveyed to Defendants.  <u>Rather, he, Tony accepted their offer.</u>  And …I'm not saying anything that Tony did; I'll take him at his word – he [Iaciofano] misinterpreted the [May 4] text.

(Doc. 65 at 24, emphasis added).[18]

It is worth noting that P. Newberry's recall of the settlement proceedings at the July 25, 2017 hearing before Judge Beckwith reflects several logical inconsistencies or misinterpretations that are belied by the written record.  Despite stating his subjective (and objectively unreasonable) belief that his May 4 text expressed to co-counsel a rejection of the Defendants' April 4 detailed offer and new counter-offer that Plaintiff would settle only if [REDACTED],[19] he admits that he never communicated the alleged counter-offer to opposing counsel.  He also admits he never heard anything back from either co-counsel or opposing counsel prior to May 10 as to: (1) whether or when Plaintiff's allegedly new counter-offer of May 4 was conveyed to Defendants; or (2) whether it was accepted by Defendants.  Considering Defendants' prior statements that [REDACTED] were not negotiable, and that all communications regarding settlement

---

[18]Though the motion to enforce the settlement agreement was not then fully briefed, Judge Beckwith presciently responded:  "Seems like it's an internal conflict and dispute amongst the plaintiff and her counsel and not between the plaintiff and the defendant."  (Doc. 65 at 25).

[19]Judge Beckwith similarly noted:  "What I'm not hearing, maybe I'm missing it, is any emails or conversation between counsel and the plaintiff where he puts Mr. Iaciofano on notice that the terms of the proposed [April 4] settlement from the defense are unacceptable and that there's some sort of counterproposal."  (Doc. 65 at 11).  "Where in all of that is "We're in agreement, ***but***…?"  (*Id.* at 12, emphasis added).

had been in writing between opposing counsel (with cc's to P. Newberry), it is exceptionally curious that P. Newberry would assume, in the absence of *any* communication from either Iaciofano or opposing counsel, that the May 4 "counter offer" ever had been communicated to opposing counsel.  In addition, it is curious that Newberry would further assume – without written verification – that Silverman had accepted the allegedly "new" counter-offer by Plaintiff.

Indeed, P. Newberry's May 14, 2016 email to Iaciofano suggests that on that date, P. Newberry may first have understood that he had conveyed something other than what he believed his wife wished.  "She did not agree to give them anything other than dismissal with prejudice, so make sure you do not file dismissal *unless they know* [REDACTED].*"* The later flurry of emails from P. Newberry to co-counsel, and from P. Newberry to opposing counsel, also suggests that P. Newberry mistakenly believed that the terms to which all counsel agreed on May 10 could still be altered.

P. Newberry's mistaken assumptions are not grounds to set aside the valid agreement, to which Plaintiff remains bound regardless of any mistake made by either of her own attorneys.  In any event, by the time that D. Newman reiterated the April 4 offer and repeated his request for trial dates on May 10, Newberry should have been aware that any assumptions he held about the supposed conveyance of a new offer from Rorick, or the supposed acceptance of that offer by Silverman, were false. Newberry's explanation  -- that when he saw Iaciofano's reply on May 10 to the request for trial dates, stating "We're settled," he thought "Tony [Iaciofano] has conveyed the offer, Kim's counteroffer, for [$REDACTED] in exchange for dismissal with prejudice. We're done." -- defies logic.  (Doc. 65 at 13).  The explanation ignores the plain fact that Iaciofano's full email – as well as all subsequent emails on May 10 by both Iaciofano

and D. Newman -- repeatedly referenced the relevant terms of Silverman's April 4 offer, including [REDACTED].  P. Newberry was included on those emails and would have (or should have) noted those references.

The May 10 emails undercut Newberry's unreasonable claim that: (1) sometime after his May 4, 2016 text to co-counsel, without Newberry himself taking any action and without any written evidence, Iaciofano communicated Plaintiff's rejection of Silverman's April 4 offer; (2) sometime after May 4, 2016, Iaciofano also communicated a new "counter" offer, agreeing on the sum of $[REDACTED] so long as Silverman would give up his non-negotiable terms [REDACTED]; and (3) that sometime between May 4 and May 10, Silverman accepted Plaintiff's new proposal in some unknown communication to Iaciofano, again without opposing counsel ever expressing the Rorick's "new" counter-offer and Silverman's acceptance in writing.  If Newberry somehow missed the explicit acceptance of Silverman's offer on May 10 (which obviously would not entitle Plaintiff to renege on the agreement), D. Newman's additional follow-up email on May 12 provided a reminder.  Still, P. Newberry waited a full week after the parties' prior express agreement, until 6:30 pm on May 17, before first communicating any hint of disagreement to defense counsel. "There is no basis to rescind a contract in the mere emotional regret of having agreed to its terms."  *Kraras*, at *9 (2004), adopted at 2005 WL 2170353 (Aug. 17, 2005).

## IV.  Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's motion to enforce the settlement (Doc. 58) be **GRANTED.**

*/s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KIMBERLY S. RORICK,                                    Case No. 1:14-cv-312

              Plaintiff,                          Dlott, J.
                                                       Bowman, M.J.
    v.

MARC H. SILVERMAN, D.D.S., et al.,

              Defendants.


**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).